# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY JAMES STANBROUGH,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>MATTHEW CATE,<br><br>　　　　　Respondent._____/ | 1:11-cv-02039-LJO-DLB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. 19] |

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Following a bench trial in the Fresno County Superior Court, Petitioner was convicted of first degree felony murder with special circumstances (Cal. Pen. Code[1] §§ 187, 190.2, subd. (a)(17)(A); count 1), residential burglary (§§ 459 & 460; count 2), and false imprisonment (§ 236; count 3).

Petitioner was sentenced to life without the possibility of parole.

Petitioner filed a timely notice of appeal. On November 13, 2009, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

Petitioner then petitioned for review before the California Supreme Court. Review was denied on February 8, 2010.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

Petitioner then filed a petition for writ of habeas corpus in the Fresno County Superior Court. The petition was denied on April 12, 2011.

On May 17, 2011, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fifth Appellate District. The petition was denied on May 27, 2011.

Finally, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on June 23, 2011, and an amended petition on October 17, 2011. The Supreme Court denied relief on November 16, 2011.

Petitioner filed the instant petition for writ of habeas corpus on December 30, 2011. Respondent filed an answer to the petition on May 24, 2012. Petitioner filed a traverse on November 2, 2012.

## STATEMENT OF FACTS

In the early morning hours of December 28, 2006, emergency personnel responded to a call at a residence on South Holly Avenue near Jensen Avenue. They found Otis Ezell Jones, Jr., lying face down on the floor with his mouth covered and gagged with duct tape. Jones was dead.

Fresno police officers investigating the inside of the residence found an extension cord tied in noose fashion underneath Jones's head. His hands were tied, bound, and taped and his legs and buttocks were tied and bound with wires. His head was wrapped in duct tape, his hands were bound with black zip ties, and a telephone cord extended from his hands to his legs in "hogtying" fashion. A white sheet bearing blood stains was located around his ankles. They also found a window covered with curtains held up by duct tape.

Officers found blood evidence at various spots in the living room, including an electrical outlet and surrounding wall. They found some blood stains on a child's rocking horse and crib/playpen, a nearby laundry basket, a cushion and couch, and also on an old-fashioned doorbell affixed to the interior of the front door.

They also found some dark, bunched-up duct tape, the same type that was used on Jones, by the front door. Another piece was found near a cushion by Jones's body.

A San Francisco 49ers beanie was located in a laundry basket, and a Dallas Cowboys beanie was located on the floor. In a set of stackable plastic drawers in the master bedroom, officers found an Oakland Raiders beanie bearing blood evidence, a brown leather mask, and a Motorola two-way radio. The officers also found a bat wrapped in black electrical tape inside a closet.

Officers found a black cord plugged into a wall of the kitchen. The cord ran up a wall, looped along the ceiling, and entered the closet in the northwest corner of the residence. The cord was held in place by "eye hooks." The cord led to a black light or "grow light" fixture in that closet. The closet also contained a

red dish or plate to catch excess water from a potted plant and green leafy substances on the carpeted floor. Inside the garage, officers found several marijuana pipes and lighters, some rolling papers, and similar evidence.

Officers investigating the outside of the residence found a black cloth that may have been a "scrunchy" hair device. Officers also found a piece of black duct tape on the elevated cement porch attached to the crime scene residence. The officers found no signs of forced entry into either the residence or the garage. The windows on the back side of the house had no signs of forced entry.

Michael Chambliss, M.D., a forensic pathologist with the Fresno County Coroner's Officer, conducted an autopsy on Jones's body. Jones was about six feet five inches tall and weighed a little more than 225 pounds. At the time of the autopsy, Jones's body was hog-tied, with binding on his wrists and ankles and a connected piece of black duct tape running between the ankles and writs area. Duct tape entirely encircled Jones's head. Black tape encircled the lower forehead, eyes, and nose and ran all the way down to the upper lip area. The wrist areas were secured with duct tape and black plastic zip ties. The ties were on the outside of the tape. The ankle areas were secured with black duct tape and a white cord.

Chambliss documented external lacerations to the face and back of Jones's head near the neck. He detected a laceration on Jones's left forehead just above the eyebrow, an additional laceration on the upper left forehead, a star-shaped laceration on the left cheek, and an abrasion on the right chin area. Some of these lacerations were at least one-half inch deep and were produced by a blunt object. They were not, however, the direct cause of death. Chambliss also found recognizable bruising of the left side of the lower lip. Some of the lacerations could have been caused by a fist.

There were multiple wrappings of the black duct tape around the head. These tightly wound segments of tape may have resulted in pattern impressions on Jones's cheek and in the compression of his nose. A white cord tightly secured Jones's ankles and left patterns where the cord encircled his ankles and lower legs. Chambliss found an abrasion on the outside of the right lower leg just above the ankle. The patterns left on Jones's skin suggested a significant tighter force in the ankle area. Chambliss found a linear abrasion passing from the top of Jones's right shoulder down onto the back portion of his right shoulder. Something other than Jones's movement caused the linear abrasion.

Based on various temperature calculations and a visit to the crime scene, Chambliss concluded that the victim expired sometime between 2:00 a.m. and 4 a.m. on December 28, 2006. In Chambliss's opinion, Jones's cause of death was suffocation via binding and partial gagging of the mouth and nose. [FN 1] Although the duct tape did not completely cover Jones's mouth, Chambliss concluded the tightness of the binding around the nose and upper lip compressed the nose and severely compromised Jones's ability to move oxygen in and out of his system. The hog-typing of Jones's body also restricted the normal mechanics of his chest and diaphragm movement. Chambliss also said if someone had held a hand over Jones's mouth, that would have completed closure of the upper airway and would have caused Jones to expire sooner. In Chambliss's opinion, Jones would have died by suffocation whether he had been face down, face up, or on his side.

FN 1. Chambliss also noted blunt head trauma on Jones's death

certificate, but not as a direct cause of death.

Chambliss recovered samples of Jones's blood, urine, and vitreous during the autopsy. Testing of the urine came back positive of metabolite of marijuana.

Stanbrough and John Daniel Gutierrez were suspects in the crime. On January 2, 2007, officers executed a search warrant at Gutierrez's Sanger residence. Officers found white electrical cord, which was similar to one used in the crime, behind the passenger seat of Stanbrough's Ford Ranger pickup truck. They found similar cord in a dresser drawer in Gutierrez's bedroom.

Officers also recovered Jones's black Honda. They found a black zip tie on the floorboard near the center console. That zip tie was similar to the zip ties used to bind Jones's body. Officers also found a black Motorola walkie-talkie in Jones's vehicle. That electronic device matched a walkie-talkie found in Jones's residence.

Amanda Coronado, a recovering drug addict and parolee, testified she formerly used crystal methamphetamine, crack cocaine, and the animal tranquilizer "KJ." She had known Stanbrough for several years because they were neighbors. She also was friends with two young men, a young Asian named Kevin and Gutierrez. On one occasion, Stanbrough, Gutierrez, Coronado, and Coronado's cousin Shanee spent an evening at Kevin's home. They talked and smoked crystal methamphetamine together. Coronado mentioned she needed some caulking and windshield wipers for her boss's truck. Stanbrough said he had some at his mother's home.

Stanbrough called for a ride and his friend Gabriel arrived in a truck. Coronado, Stanbrough, Shanee, and Gabriel departed in the truck and ultimately went to Stanbrough's mother's home. Along the way, Stanbrough asked Coronado and Shanee whether they wanted to "do a jale." Coronado explained the phrase "do a jale" could refer to one of two things. A "jale" could be a "come up," i.e., an invitation to commit a crime. She also said the phrase could refer to "dope and crystal meth." [fn 2.]

FN 2. According to Coronado, Stanbrough always characterized his entry into his sister's home as a "jale" and not as a robbery or burglary.

They arrived at Stanbrough's mother's house in the vicinity of the old Golden State Highway and went to a little shed behind the house. At the shed, Stanbrough said something about wanting to go someplace and take some things. Coronado was under the impression the job was going to take place right away. Stanbrough took a bunch of black plastic zip ties from the shed, along with the caulking and wipers he promised Coronado. The ties were secured into a bunch with a "[z]ip tie holding them together."

When Stanbrough and Coronado returned to Gabriel's truck, she discussed the job with Shanee and they decided not to participate because it did not sound right. Coronado told Shanee that Stanbrough wanted to use the zip ties. Gabriel said he was using his father's truck and did not want to get into trouble. Stanbrough and Gabriel took Coronado and Shanee to the home of Coronado's mother and then departed.

A day or two later, Stanbrough and Gutierrez visited Coronado in a little brown truck and said they were still going to do the job. Stanbrough asked

4

whether Coronado and Shanee wanted to participate. When Coronado asked some questions, Stanbrough said he was going to go to his sister's house and rob the occupants to get a stereo. Stanbrough also told Coronado that his sister [fn 3] knew about the possible robbery. He explained that his sister's husband had been hitting her and his sister wanted to get back at him. According to Stanbrough, his sister did not care whether he took property when he went to her house.

FN 3. The victim, Jones, was married to Stanbrough's sister, Amanda Jones.

Stanbrough told Coronado he was going to enter his sister's house and tie up his sister's husband. He asked Coronado to loan him the fake gun she had found on the sidewalk, a gun that appeared to be a real weapon. When Coronado asked whether Stanbrough would be recognized inside his sister's home. Stanbrough said he would wear a blue "pano" (handkerchief) to cover his face. She asked Stanbrough what kinds of things were in the sister's home and he said, "lots of stuff, just lots of stuff." He also said his sister was going to pay him for the job and that meant Coronado would get paid if she participated. Stanbrough told Coronado his plan was to tie up the victim and scare him, but not kill him.

After staying briefly with Coronado, Stanbrough departed with Gutierrez. She called Stanbrough several times, using her mother's cell phone. Stanbrough did not answer the first time. The second time, he answered and she asked whether he was going to come by for some more crystal methamphetamine. Stanbrough told her he was busy doing what he "was going to do," which Coronado interpreted as the planned robbery. Coronado believed Stanbrough was at his sister's house when Coronado made these calls. Stanbrough eventually called Coronado back at "tweaker time" (a methamphetamine user's term for late at night) and said he was going to pick her up.

Stanbrough and Gutierrez showed up in a green vehicle at sunrise. Shanee was with Coronado and the four of them started smoking in the car. Coronado said Stanbrough looked tired and Gutierrez acted "like a little bitch ... like something was wrong with him." The quartet took off to look for a store to buy alcohol. Along the way they dropped off Gutierrez so he could change his clothes. Gutierrez changed at Stanbrough's request. When they again picked up Gutierrez, he was wearing different clothes and carrying his old clothes. They went to a meat market to buy liquor. Inside the store, Gutierrez appeared shaken and told Coronado, "I've got to leave town. I've got to leave town.... He's dead." They made their purchase, returned to the car, and traveled to Coronado's mother's apartment. Stanbrough asked her for a change of clothes and Coronado said she would look inside the apartment. During their travels, Coronado noticed a little bit of blood on Gutierrez's face and by the ear on Stanbrough's face.

Coronado had Stanbrough enter the apartment quietly because everybody was still asleep. She gave him a sweat outfit, he changed, and she put his old clothes in a plastic bag. She also put Gutierrez's old clothes in the bag, wrapped the bag, and threw it in the trash. They reentered the car and she gave Stanbrough a moistened paper towel to clean the blood of his ear. She then threw away that towel separately. Coronado admitted she was shocked when she saw the blood on Gutierrez's face in the meat store. Stanbrough and Gutierrez stayed a bit longer and then departed.

Amanda Jones was interviewed on the morning of the crime. She identified Stanbrough, her brother, as one of the participants. She also told the officers that a pink cell phone recovered from the bed in the master bedroom of the crime scene house was hers. Police personnel retrieved information from the

5

phone, including stored phone numbers, the number of the device itself, and the calls that recently had been placed from the phone. Amanda Jones said the phone was used during or just prior to the crime and a call made shortly after 3:00 a.m. from the phone was noted. Stanbrough later confirmed the 3:00 a.m. call listed on her phone was to the cell number he was using at the time. Stanbrough also told the officers that his sister had purchased the cell phone for him.

On the afternoon Amanda Jones was interviewed, the officers instructed her to make a controlled call to the number from the 3:00 a.m. call. She initially agreed to make the call but then attempted to negotiate with the officers. Her demeanor was quite and calm and she ultimately made the call. As soon as Stanbrough answered the telephone, she became hysterical, incoherent, hard to understand, and was taking exaggerated deep breaths and unable to speak complete words. She eventually accused Stanbrough of doing something to her husband and Stanbrough repeatedly asked his sister what she was talking about.

Cingular cell phone records for Stanbrough's phone showed a number of calls made and received on December 28, 2006. A 12:45 a.m. call was noted at a tower in Sanger, Stanbrough's city of origin. Four other calls, extending from 12:54 a.m. to 1:04 a.m., also were noted at that tower and a companion tower. Calls made at 1:23 and 1:25 a.m. were noted at a tower on Fresno Street in the Kearney area of Fresno. At 1:38 a.m. a call was noted at a tower on East California Avenue, a few blocks from Jones's residence. A series of calls took place between 1:38 a.m. and 4:04 a.m. and were noted at the California Avenue tower. At 4:33 a.m. a call was noted at a South Orange Avenue tower. The latter tower is located east or southeast of the Jones residence on South Holly Avenue. A call made 38 seconds later was noted at a tower on East Jensen Avenue near Fresno Pacific University. At 4:36 a.m. a call was noted at a tower on South Peach Avenue, indicating the phone was continuing in an easterly direction. Between 4:50 a.m. and 5:16 a.m., calls made from the phone were noted at towers in the Sanger area. Stanbrough was arrested in the vicinity of Breckenridge Road and Weed Patch Highway in Bakersfield at 7:00 p.m. on May 4, 2007.

When the officers received word of Stanbrough's arrest, they drove to Bakersfield, made contact with Stanbrough, and interviewed him after he waived his Miranda [fn 4] rights. Stanbrough was "dejected, depressed, extremely quiet, and solemn" during the interview. He was very disheveled and dirty and dressed in an old jacket and dirty, wrinkly clothes. Throughout the interview, Stanbrough professed that he did not shoot Jones, suggesting a belief that Jones had been shot. [fn 5] He initially denied any involvement in the crime but later gave details of his participation.

[FN 4] *Miranda v. Arizona* (1966) 384 U.S. 436.)

[FN 5] A newspaper article incorrectly reported that Jones had been shot.

Stanbrough said Amanda Jones wanted the marijuana removed from her home because of the baby. The plants and a growing light were in the closet and she was concerned that someone would smell the plants and her son would be taken away as a result. She was angry about this situation and wanted Stanbrough to remove the plants while Jones was asleep. She also told Stanbrough that Jones was mean to her and possibly beat her. She said Jones was mad at her because she wanted him to get rid of the weed plants. Stanbrough said he did not dislike Jones because he had a good job and took care of his sister.

6

Amanda Jones had called Stanbrough late at night for about a week and had asked him to remove the contraband. She said she was going to leave the back door open and the car keys inside a weed plant pot. She asked him to just take the weed and get rid of it. He agreed to do so but kept putting off the task. At midnight or 1:00 a.m. on December 28, 2006, she called Stanbrough and told him to come get the weed. She also said Jones was a heavy sleeper. Stanbrough previously had left a mask at the house and asked her if she thought Jones would recognize him. Stanbrough said that if Jones awakened during the removal of the weed, Stanbrough intended to tell him that Amanda Jones wanted the weed gone because of the baby and that he should not jeopardize his job as a security officer.

Stanbrough had someone drop him off at the Jones residence in the middle of the night. When Stanbrough arrived at the house, he said the weed was outside on the porch. Stanbrough had already obtained the keys from his sister and he left in that vehicle. He threw the plants in a canal and left the car at a location specified by his sister. According to Stanbrough, the next thing he knew, someone had been shot, but denied shooting anyone. Amanda Jones called him, crying, and asked what he had done to Jones. Stanbrough learned a parole search had taken place at his mother's home. He panicked and left town. Stanbrough initially declined to name anyone else involved in the incident.

At that point, the officers told Stanbrough they knew he had been inside the residence. Stanbrough changed his story, said he was with a friend, and explained that Jones awakened while they were there. The duo became scared because Jones was a large man. He charged Stanbrough's friend and they started fighting. Stanbrough held his leg and the friend took him down. Stanbrough could not say anything because Jones might recognize his voice. The interior of the house was dark and he could not see Stanbrough. The trio fought and all three of them kicked and threw punches. At one point, a curtain fell down and Stanbrough put it back up with duct tape. Jones became tired and Stanbrough and his friend used duct tape all over his body to secure him. Stanbrough claimed he just taped and zip-tied Jones's feet and legs and then went to see whether his sister was awake. She was asleep in the bedroom. She did not awaken until Stanbrough and his friends obtained the weed plants. The car keys were in the weed pot. Stanbrough tried to get the grow lights because his sister wanted everything removed. Stanbrough said the ties and duct tape came from Jones house. The ties had been used on computer cords and Stanbrough found the ties and duct tape on a little table by the television.

Stanbrough claimed he got the weed plants, returned inside, and found Jones had been shot and it "was like, dead[,] oh my god." Stanbrough said he had no gun with him, his companion had no gun, but he speculated Jones, a security officer, may have had a gun. In any event, Stanbrough said he never heard a gunshot.

The officers advised Stanbrough that his sister, Amanda Jones, was found on the front porch with duct tape on her. Stanbrough did not think that he or his companion put the tape on her. The detectives asked whether his sister ever told him that "Otis was kicking her ass." He denied such a conversation. Stanbrough claimed he told her that Jones was big, had never done anything wrong to her, had cared for her over the years, and that he, Stanbrough, had no beef with him. Stanbrough said his intent in going to the house was to get the weed plants and not to "kick Otis' ass."

Stanbrough said he and his companion entered the house through the

7

unlocked garage door. The door had a knob on the outside and there was nothing to hold it closed. Amanda Jones had told Stanbrough she was going to leave the garage door and the interior door open. She told him Jones was a heavy sleeper and that Stanbrough could get the weed out. According to Stanbrough, his companion duct taped Jones and Stanbrough said he wanted to check on the safety of his sister and her baby. Stanbrough grabbed the weed plants and tried to grab all of the lighting devices because it was sometime between 4:00 and 6:00 o'clock in the morning. Stanbrough said he left a beanie, some gloves, a leather jacket, and some walkie-talkies for his sister to hide after the early morning entry.

During the struggle with Jones, Stanbrough said he duct taped Jones's feet and his companion duct taped Jones's hands. When he and his companion left, Jones had his feet bound together and Jones was groaning as if he were hurting. Stanbrough said he did not turn on any lights. He went through the front door, unlocked and warmed up Jones's car, and went back inside and got the weed plants and box. He placed the box in the car trunk. Stanbrough later said the keys to Jones's car were inside the weed pot. Stanbrough also explained there were two big pots, but he did not know how many plants were in those pots.

As to the contraband, Stanbrough again said he threw the plants into a canal in Sanger. Stanbrough did not remember throwing the box out or selling or trading property from the box. Stanbrough admitted he was a crystal methamphetamine user but did not sell the plants to make money. Stanbrough claimed he was not using crystal methamphetamine user but did not sell the plants to make money. Stanbrough claimed he was not using crystal methamphetamine on December 28, 2006, because he did not have any money and had just come from the hospital. He also said he did not drink alcohol. Stanbrough later told officers he could not remember if he put the grow lights in Jones's car. He did grab a heavy box with cords sticking out and he thought the box might contain a computer.

After leaving the house on South Holly Avenue, Stanbrough took Jones's black Honda and drove away. He received a call from a girl asking to buy crystal methamphetamine. Stanbrough said he had some in Fresno but he was already in Sanger at the time he received the call. The girl kept calling Stanbrough and they eventually met. When the girl saw Stanbrough, she said he had "blood and shit" on his face.

Stanbrough told the officers his sister had loaned him some money earlier and he told her he would pay her back once he started working. When the officers questioned why he, a parolee, would risk going into the Jones home for no compensation, Stanbrough said, "I would do anything for my sister." When the officers asked about Jones's condition upon Stanbrough's departure, Stanbrough said he touched Jones and could feel breath going in and out. Although his mouth was taped, there was a hole and Stanbrough said he "felt air" and saw his stomach go up and down. Stanbrough further said he did not understand how Jones could get shot because Stanbrough did not shoot him and his sister had said there was no gun in the house. When asked about compensation for his companion, Stanbrough said he gave the man gas for his car and said he would "get him high."

Stanbrough asked the officers what had happened to his sister. They said she had moved to a new residence, said she felt guilty, and ended up hanging herself. Stanbrough sobbed when he received the news of her passing. The officers later told him the burial was the Thursday prior to his apprehension and some family members were present.

8

> The officers asked Stanbrough whether Jones was supposed to die on December 28. Stanbrough said he was not supposed to die and noted that Jones had cared for his sister over a four- or five-year period. Although Amanda Jones said that Jones hit her and took her phone away, Stanbrough never saw such conduct. When the December 28 encounter became physical, Stanbrough said Jones had to be restrained because "he was big[,] man[,] he'll fuck us up." Stanbrough said he was scared because he did not know whether Jones would call the police, beat up his sister, or take away the baby. After Jones was restrained and Stanbrough took the contraband, he told his sister that he loved her. He also told her he left his beanie and mask.

(Resp's Ans., Ex. A at 2-13.)

## DISCUSSION

I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.  Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254

10

apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

III.   Ineffective Assistance of Trial Counsel and Appellate Counsel

Petitioner contends that defense counsel failed to reasonably investigate and present a third party culpability defense to the trier of fact.

The California State Superior Court held that petitioner failed to meet his burden of showing prejudice created by both his trial and appellate counsel. The court stated in pertinent part:

> [E]ven assuming that Petitioner's former counsel failed to act with the required level of competence, Petitioner has failed to present facts demonstrating that there is a reasonable probability that if Petitioner's former counsel had adequately investigated his now deceased sister's statement and presented a third party culpability defense, there would have been a different outcome to Petitioner's trial. Inherent in Petitioner's argument is that there was insufficient evidence to find him guilty of the charged offenses. However, the Court of Appeal affirmed Petitioner's conviction. (*People v. Stanbrough* (2009) Cal. App. Unpub. LEXIS 9004.) Indeed, in the appellate opinion, the Court of Appeal noted that, citing *People v. Clayton* (1998) 65 Cal.App.4th 418, even if Petitioner's sister consented to Petitioner's entry to the house, Petitioner would still be guilty of burglary as he did not have consent of the victim (Petitioner's sister's husband) who had joint possession of the house (*Ibid.*) Further, the Court of Appeal noted that, even if Petitioner were considered an aider and abettor, there was sufficient evidence to find Petitioner guilty of murder with special circumstances (*Ibid.*) Therefore, Petitioner has failed to demonstrate that his attorney's allegedly objectively unreasonable actions or inactions caused petitioner to suffer any actual prejudice. […]
>
> Lastly, Petitioner argues that his appellate counsel was ineffective. Petitioner alleges that his appellate counsel that Petitioner's trial counsel was ineffective by failing to raise the third party culpability defense. As discussed previously, Petitioner fails to show any prejudice in fact that his trial counsel did not raise a third party culpability defense. Thus, the court finds that Petitioner fails to raise a prima facie case for relief.

(LD 9 at 2-3.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151

11

F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; Harrington v. Richter, 131 S.Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.").  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  It is not enough "'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Richter, 131 S.Ct. at 787 (internal citation omitted).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).


Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); See, also, Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

A fairminded jurist could reasonably agree with the state superior court that Petitioner's third party culpability defense was without merit. Petitioner third-party culpability defense that is sister was the actual murderer, is based on his sister's consent to enter the residence. However, the consent of Petitioner's sister is not relevant, as the record demonstrates that Petitioner did not have the consent of his sister's husband (who shared joint possession of the house) and his entry constituted burglary under California law. Moreover, even if Petitioner did have his sister's consent he would have been her aider and abettor in the burglary. Thus, given the lack of evidence that any consent was given (beyond Petitioner's own self-serving declaration), there is no basis to conclude that Petitioner was prejudiced in any way by counsel's failure to present such evidence, and the end result would not have been any different had counsel investigated and presented such a defense.

For the same reasons, a fairminded jurist could conclude that appellate counsel did not render ineffective assistance nor was Petitioner prejudiced by appellate counsel's failure to raise this nonmeritorious claim on appeal. See Strickland, 466 U.S. at 697; see also Boac v. Raines, 769 F.2d 1341, 1344 (9th Cir.1985) (appellate counsel has no duty to raise nonmeritorious arguments); Jones v. Barnes, 463 U.S. 745, 754 (1983) (appellate counsel must exercise professional judgment in selecting issues to be raised on appeal and does not have the duty to raise every claim suggested by a client); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir.1989) (failure to raise a meritless legal argument does not constitute ineffective assistance of counsel).

IV.   Insufficient Evidence

Petitioner contends there was evidence to support his conviction for felony murder. Petitioner argues again that he had consent from his sister to enter the residence and take certain items, and therefore cannot be guilty of the burglary and resulting felony murder with special circumstances.[2]

In the last reasoned decision, the California Court of Appeal held as follows:

> Stanbrough contends his sister consented to his entry into the South Holly Avenue home, thereby obviating a burglary charge. He further argues that to the extent he entered the house to perpetrate assaultive conduct, the merger doctrine precluded application of the felony-murder rule. Therefore, Stanbrough maintains there was insufficient evidence to support the convictions of burglary, felony murder, and the felony-murder special circumstance.
>
> **Standard of Review**
>
> In reviewing a criminal conviction for the alleged lack of evidentiary support, we must review the whole record in the light most favorable to the judgment. We must determine whether the record discloses substantial evidence, i.e. evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (People v. Hillhouse (2002) 27 Cal.4th 469, 496.) We must view the evidence in a light most favorable to the People and presume in support of the judgment the existence of every fact the trier reasonably could deduce from the evidence. If the circumstances reasonably justify the findings of the trial court, reversal is not warranted simply because the circumstances also might be reconciled with a contrary finding. The test on appeal is whether there was substantial evidence to support the conclusion of the trier of fact and not whether guilt was established beyond a reasonable doubt. (People v. Williams (1971) 5 Cal.3d 211, 214.) Challenges to the evidentiary sufficiency of special circumstance findings are governed by the same test. (People v. Ochoa (1998) 19 Cal.4th 353, 413-414.)
>
> **The Burglary**
>
> Stanbrough initially contends he had his sister's consent to enter her house and take property and therefore no burglary was committed.
>
> A burglary charge requires evidence the accused entered the residence with the specific intent to steal, take and carry away the personal property of another of any value and with specific intent to deprive the owner permanently of such property, or to commit another felony. (§ 459.) Lack of consent, by itself, is not an element of the offense. Forcible entry is not required either. (*People v. Chambers* (1961) 189 Cal.App.2d 780, 785.) There are occasions, however, when consent given by the owner of the property will constitute a defense to a burglary charge. (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1397.) One such occasion occurs when the owner actively invites an accused to enter, knowing the illegal

---

[2] Petitioner presents these claims as two separate claims to the state court as claims three and four. Because the state appellate court addressed these together as a single claim, this Court will do the same.

14

felonious intention of the invitee. (*People v. Superior Court* (*Granillo*) (1988) 205 Cal.App.3d 1478, 1483.)

In *People v. Clayton* (1998) 65 Cal.App.4th 418 (*Clayton*), Richard August hired Clayton to murder Richard's wife, Kathleen. Richard supplied Clayton with a key to gain entry to the house where Richard and Kathleen lived with their children. Clayton entered and attacked Kathleen but she fought back and Clayton fled. He was ultimately convicted of conspiracy to commit murder, attempted murder and burglary, enhanced by a deadly weapon allegation. Clayton appealed, contending his burglary conviction could not stand because he entered the house with Richard's consent. The appellate court disagreed and affirmed.

The court noted that independent of the consequences of the intended felony, there is a danger of violence when one person in possession of the premises consents to a third person's entry for the purpose of injuring a person with joint possession of the premises. Section 459 is aimed at the danger caused by the unauthorized entry itself. The burglary laws of California exist to punish the dangers to personal safety, i.e., the danger that an intruder will harm the occupant in attempting to gain entry to commit an intended crime or in attempting to escape, or that the occupant will react in anger or panic and cause more violence. (*Clayton*, *supra*, 65 Cal.App.4th at pp. 422-423.)

In *Clayton*, one of two persons with a joint right to possession of the same premises gave consent to a third person to enter the premises to commit a felony upon the other person with the joint right of possession. That Richard consented to Clayton's entry and knew about Clayton's felonious intent did not confer an unconditional possessory right upon Clayton to enter the residence for the purpose of injuring Kathleen, who was unaware of Clayton's intent and did not endorse it. That the intended felony entailed violence or potential violence did not prevent a conviction of burglary where the other elements of section 459 were proved. (*Clayton*, *supra*, 65 Cal.App.4th at pp. 423-424.)

Here, Stanbrough repeatedly insists he did not enter the house to rob Jones personally. Rather, he contends he had the consent of his sister, Amanda Jones, to enter the residence to seize and remove illegal plants and growing apparatus.

Issues of credibility are not reweighed or redetermined on appeal. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The trial court, as trier of fact, easily could have concluded that Stanbrough's claims of consent to enter, permission to take property, and lack of intent to injure Jones simply were not credible. This is particularly true given his changing stories, conflicting accounts, and blatant evasions to police officers upon his apprehension in May 2007. As the People point out, nothing in the record suggests that Amanda Jones gave Stanbrough and Gutierrez permission to enter her residence, steal property jointly owned with Jones, and commit a residential robbery in which her husband was beaten, bound, and gagged.

Stanbrough's claimed defense of consent to the burglary must be rejected.

**Felony Murder**

Stanbrough further argues a burglary based on entry into a building with the intent to commit assaultive conduct does not invoke felony-murder rule because the assaultive crime merges with the underlying homicide.

15

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Murder that is committed in the perpetration of robbery, burglary, or other statutorily enumerated felonies is first degree felony murder. (§ 189; *People v. Pulido* (1997) 15 Cal.4th 713, 716 (*Pulido*).) The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether that killing is intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*); *People v. Dillon* (1983) 34 Cal.3d 441, 477.)

The felony-murder rule generally acts as a substitute for the mental state ordinarily required for murder; the only mental state required is the specific intent to commit the inherently dangerous underlying felony. (*Cavitt*, *supra*, 33 Cal.4th at pp. 197, 205.) The killing need not occur in the midst of the commission of the felony, so long as that felony is not incidental to or an afterthought to the killing. A homicide occurs in the perpetration of an enumerated felony for purposes of the felony-murder rule if both offenses were part of a continuous transaction. Circumstantial evidence may provide sufficient support for a felony-murder conviction. Nevertheless, the felony-murder rule does not apply to a burglary committed solely to assault or kill a homicide victim. (*People v. Prince* (2007) 40 Cal.4th 1179, 1259, 1262.)

Felony-murder liability may be imposed on a nonkiller when a human being is killed by one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate an enumerated felony, whether such killing is intentional, unintentional, or accidental. (*Cavitt*, *supra*, 33 Cal.4th at p. 200.)

California cases establishing the complicity of a nonkiller in a felony murder have required, at a minimum, that the accomplice have been, at the time of the killing, a conspirator or aider and abettor in the felony. (*Pulido*, *supra*, 15 Cal.4th at p. 723.)

Under California law, it is no defense to felony murder that the nonkiller did not intend to kill, forbade his associates to kill, or was himself unarmed. (*Cavitt*, *supra*, 33 Cal.4th at p. 198, fn. 2.) "[A] nonkiller's liability for felony murder does not depend on the killer's subjective motivation but on the existence of objective facts that connect the act resulting in death to the felony the nonkiller committed or attempted to commit." (*Id.* at p. 205.) Otherwise, the nonkiller's responsibility would vary based merely on whether the trier of fact believed the killer killed the victim by accident, because of a personal grudge, to eliminate a witness, or simply to find out what killing was like. (*Ibid.*)

Here, the trial court, as trier of fact, reasonably could have concluded that Stanbrough was the actual killer of Jones. As the People point out, "The trial record establishes [Jones] as the major planner and dominant actor in these offenses." Stanbrough discussed the offenses in advance with Coronado and specifically discussed his intent to tie up and cover up Jones, to wear a blue "pano" or handkerchief as a mask, to psych Jones out with a "cuete" or fake gun he sought to borrow from Coronado, and to take things from the South Holly Avenue house. Before the offense, he secured at least some of the zip ties from a shed at his mother's home.

On the date of the offenses, Jones awakened and resisted the intruders. A struggle took place and Stanbrough and Gutierrez inflicted a beating to Jones.

16

>During that struggle, some curtains came down and Stanbrough directed his companion to use duct tape to put them up. That act suggested the need for concealment of the criminal offenses that took place inside the home. Chambliss, the forensic pathologist who conducted the autopsy of Jones, concluded the cause of death was a combination of duct taping of Jones's head and hog-typing him. Together, theses acts compromised Jones's respiration. Chambliss also noted that Jones suffered from blunt force head trauma. Although that trauma was not the direct cause of death, Chambliss deemed it highly significant.
>
>From all of the facts and circumstances, particularly Stanbrough's highly evasive and contradictory interview with Fresno police detectives upon apprehension, the trial court reasonably could conclude that Stanbrough was the active perpetrator of the killing of Jones and that the homicide occurred in the perpetration of an enumerated felony. The trial court also reasonably could conclude that Stanbrough's intent upon entering the residence was to steal, not to assault Jones, thus precluding any argument of merger.
>
>**Special Circumstance**
>
>Stanbrough lastly contends he was a nonkiller and did not have the appropriate mental state for the trial court to sustain the special circumstance as to an aider and abettor.
>
>Section 190.2, subdivision (a) states in relevant part:
>
>"The penalty for a defendant who is found guilty of murder in the first degree is death of imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] ... [¶]
>
>"(17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [¶] ... [¶]
>
>"(G) Burglary in the first or second degree in violation of Section 460."
>
>To support a finding of special circumstance murder against an aider and abettor based on murder committed in the course of an enumerated felony, the prosecution must show the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds (c), (d).) "[R]eckless indifference to human life" means "'a subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' [Citation.]" (*People v. Proby* (1998) 60 Cal.App.4th 922, 927-928.)
>
>At trial, Chambliss described the horrific death of Jones in graphic detail and we have independently summarized the forensic pathologist's findings and conclusions at great length above. Stanbrough's claim that he had no subjective awareness that his participation in the felonies involved a grave risk of death is belied by the record on appeal. The trial court properly found the special circumstance to be true and Stanbrough's challenge must be rejected.

(Resp's Ans., Ex. A, at 15-21.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

The AEDPA adds another layer of deference over the already deferential Jackson standard. Under the AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably applied the principles underlying the Jackson standard when reviewing the petitioner's claim. See e.g., Juan H. v. Allen, 408 F.3d 1262, 1274 n.12 (9th Cir. 2005); Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997) (en banc) (recognizing that "unreasonable application" standard applies to insufficient evidence claim).

A. Consent

Petitioner argues again there was evidence that he had consent from his sister Jones (who also had possession to the residence) to enter and take certain items. He reasoned this consent negated the other evidence of burglary and resulted in an unconstitutional conviction.

As an initial matter, the appellate court properly noted that, "nothing in the record suggests that Amanda Jones gave [Petitioner and his codefendant] permission to enter the residence, steal property jointly owned with Jones, and commit a residential robbery in which her husband was beaten, bound, and gagged." (Ex. A at 18.) As a result, the appellate court properly reasoned that the jury rejected Petitioner's claim of consent to enter and take certain property as not credible. The state court, as well as this Court, cannot re-weigh the evidence and Petitioner's claim to the contrary must be rejected.

In addition, the appellate court determined that under California law, although consent may be defense to burglary, it is not an element of burglary. However, if two individuals jointly possess property and consent is given to a third party to victim the co-possessor, such third party did not receive proper consent to rise to the level of a viable defense to burglary under California law. Accordingly, Petitioner's claim to an entitlement to a defense of consent is without merit.

B.  Felony Murder

Petitioner also argued that upon entering the residence, he only harbored an intent assault the victim. While it is true that under California's "merger" doctrine, felonious assault may not be used as a predicate felony for applying the felony-murder rule, such was not the case in this instance. The state appellate court and the trier of facts determined that Petitioner entered the residence with intent to burglarize the victim, and while in the transaction of that burglary, Petitioner aided his co-defendant in the fatal beating and duct taping of the victim. Thus, Petitioner's claim is without merit.

C.  Special Circumstance

Petitioner further argues he was not the actual killer and did not harbor the required mental state for a finding on the special circumstance of him being an aider and abettor. The appellate court determined that under California law liability of an aider and abettor special circumstance may be found if Petitioner acted with "reckless indifference to human life" which is "a subjective awareness of the grave risk to human life created by his or her participation in the felony." The appellate court acknowledged that the forensic evidence demonstrated that the victim suffered a "horrific death" of which Petitioner was clearly aware. Thus, the Court of Appeal reasonably rejected this claim.

V.  Cruel and Unusual Punishment

Lastly, Petitioner contends his sentence of life without the possibility of parole was cruel and unusual punishment in light of his offense and criminal history. Petitioner presented this claim on collateral review-which was denied without a statement of reasons.

While a criminal sentence that is not proportionate to the conviction offense may violate the Eighth Amendment, the Untied States Supreme Court has specifically held that "the crime of felony murder without specific intent to kill, [is] a crime for which 'no sentence of imprisonment would be disproportionate.'" See Harmelin v. Michigan, 501 U.S. 957, 1004 (1991) (quoting Solem v. Helm, 463 U.S. 277, 290 (1983)); see also Harris v. Wright, 93 F.3d 581, 585 (9th Cir. 1996) ("mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences. [Citation] Like any other prison sentence, it raises no

inference of disproportionality when imposed on a murderer."). Petitioner was charged with, among other things, felony murder and received a life-without-parole sentence. Pursuant to the clearly established law set forth in Solem, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  **November 27, 2012**          /s/ Dennis L. Beck
                                        UNITED STATES MAGISTRATE JUDGE